## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

DEMOBLOX, INC.,      )
      )
   Plaintiff,      )
      )      CIVIL ACTION NO.
vs.      )
      )      _____
TERMINUS SOFTWARE, INC.;      )
SALEO, INC.; JUSTIN MCDONALD;      )      **JURY TRIAL DEMANDED**
and DANIEL HELLERMAN,      )
      )
   Defendants.

## VERIFIED COMPLAINT

Plaintiff DemoBlox, Inc. hereby files this Complaint against Defendants Terminus Software, Inc., Saleo, Inc., Justin McDonald, and Daniel Hellerman (collectively, "Defendants"), showing the Court as follows:

## NATURE OF THE ACTION

1.

DemoBlox, Inc. ("DemoBlox") is an Atlanta-based company that created a tool to help software companies give dynamic, real-time sales pitches in their live environment—a product not previously available in the marketplace. DemoBlox provides companies with customized data for sales pitches and product

demonstrations ("demos") that allows a sales team to demonstrate the capabilities of their software products in real time.

2.

While there are many companies that provide data to use for sales pitches and product demonstrations, this data is provided in a "sand-box" or pre-recorded environment where only certain pre-selected data can be used. Until recently, only DemoBlox provided customized data—created to the specifications of a client, its industry, and its particular project that can demonstrate the full capabilities of the customer's software in its live environment.

3.

As with many web-based products that provide a simplified and streamlined customer interface, on the back end, DemoBlox is a sophisticated, complicated product that took considerable time to develop. The initial code for DemoBlox was created by Brian Fisher ("Fisher") and Peter Kim ("Kim") in 2016. Since 2016, the code has been refined and perfected to the current product; going through hundreds of different iterations to achieve a working code and excellent onboarding experience for new users. The source code for DemoBlox, and its supporting processes and procedures, are trade secrets that are carefully protected by DemoBlox.

4.

In January 2021, Defendant Terminus Software, Inc. ("Terminus") approached DemoBlox to learn more about its product. The companies engaged in negotiations over time, and Terminus eventually decided to become a customer of DemoBlox.   Pamela Brungardt, a Senior Solutions Consultant employed by Terminus, stated to Fisher and Kim that DemoBlox's services were urgently needed because Terminus had been unsuccessful in its attempt to create an in-house product to accomplish the same goal.  Thus, Terminus and DemoBlox entered a Mutual Non-Disclosure Agreement ("MNDA") under which the companies began to explore a customer relationship.

5.

Pursuant to and relying upon the terms and provisions of the MNDA, DemoBlox shared its proprietary, trade secret information with Terminus and its employees for the purpose of the establishing a customer relationship with it and them.

6.

 The sole purpose of sharing this information—so far as DemoBlox understood—was to facilitate the sale of DemoBlox services to Terminus.

3

7.

Unbeknownst to DemoBlox, employees and officers of Terminus simultaneously began to form a competing venture, to provide the exact same services that DemoBlox provides (that Terminus had previously been unable to accomplish internally).

8.

On September 21, 2021, Saleo, Inc. ("Saleo") was incorporated in Delaware. All three founders of Saleo are either former or current Terminus employees. These individuals were employees at the time that DemoBlox shared its trade secret information and documents under the terms of the MNDA.

9.

Saleo recently announced that it raised $1.5 million in funding from eight investors. Three of those investors are officers of Terminus (CEO, CPO, and Co-Founder), including the individual who was DemoBlox's primary point of contact for the relationship. One of those three individuals continues to access the trade secrets of DemoBlox as recently as June 9, 2022.

10.

According to its public website, Saleo provides the exact same services, in the exact same manner as those provided by DemoBlox. Saleo founders and investors

4

were directly privy to the trade secrets of DemoBlox through their employment and relationship with Terminus.   Without Terminus having had the information of DemoBlox, Saleo would not have been able to enter the market.   Upon information and belief, Saleo and its founders are using the proprietary, trade secret information of DemoBlox to create their own products but have not yet achieved a working solution.

11.

Upon information and belief, Terminus is now a customer of Saleo.

12.

DemoBlox brings this action for damages and preliminary and permanent injunctive relief to address Defendants' misappropriation and use of DemoBlox's trade secrets, Terminus' breaches of contract, and Defendants' violations of federal and state law.

## THE PARTIES

13.

Plaintiff DemoBlox, Inc. is a for profit corporation organized and existing under the laws of the State of Georgia, with its principal place of business at 6595 Roswell Road, Suite G-6018, Atlanta, GA, 30328.

14.

Defendant Terminus Software, Inc. is a corporation organized and existing under the laws of the State of Delaware. Its principal place of business is 3340 Peachtree Road, Suite 300, Atlanta, GA, 30326. Terminus may be served through its registered agent Ben Warren at the same address.

15.

Defendant Saleo, Inc. is a corporation organized on September 21, 2021 under the laws of the State of Delaware and existing under such laws to this day, with its principal place of business at 6940 Wakehurst Place, Cumming, GA, 30040.  Saleo registered to do business in Georgia on April 22, 2022. It may be served through its registered agent C T Corporation System at 289 S Culver Street, Lawrenceville, GA 30046.

16.

Defendant Justin McDonald is a Georgia resident residing at 200 Red Oak Ln, Alpharetta, GA 30009-3658.  According to his LinkedIn profile (attached as Exhibit A), McDonald was employed by Terminus as Senior Vice President, GM of Conversational Marketing through May 2022.  He also represents that he is Co-Founder and CEO of Saleo beginning in September 2021.

17.

Defendant Daniel Hellerman is a Georgia resident residing at 324 Spotted Ridge Cir, Woodstock, GA 30188-2625.   According to his LinkedIn profile (attached as Exhibit B), Hellerman was employed by Terminus as recently as May 2022 as VP Media Strategy & Architecture. He also lists that he is Co-Founder and CPO of Saleo beginning in September 2021.

## JURISDICTION AND VENUE

18.

This Court has personal jurisdiction over all Defendants because they have their principal place of business in Georgia, conduct business continually in Georgia, or are citizens of the state of Georgia.

19.

This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq.* ("DTSA"), as well as supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy.

20.

Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) because each of the Defendants reside in this judicial district and a substantial part of the events giving rise to DemoBlox's claims occurred within this judicial district.

**FACTS**
**Background of DemoBlox**

21.

Kim and Fisher both have extensive experience in the software industry. In 2015, Kim, a Senior Solutions Consultant, and Fisher, a Solutions Architect, were employed at a marketing automation company. They began searching for a tool that would create demonstration data to use in providing a product demonstration and winning a deal. Kim and Fisher spent numerous months evaluating multiple solutions from other companies, but nothing on the market met their needs. They decided to create their own custom product that would provide demo data for sales that utilized personalized and relatable data to instantly connect with the prospect.

22.

In 2016, Kim and Fisher began developing a custom demonstration data program which later became DemoBlox solution. As seasoned solutions consultants and solutions architects, they developed a proprietary approach to demo

data, which results in an organic experience for the prospect during the sales demonstration. When compared to existing technology, i.e. data from "sandbox" or pre-recorded experience, the DemoBlox proprietary approach is a great technological leap forward.

23.

Kim and Fisher went through hundreds of different iterations to achieve the DemoBlox solution, both creating a working source code and refining the onboarding experience for new users.

24.

On November 11, 2020, Kim and Fisher formally incorporated DemoBlox as a domestic profit corporation and began to sell its product to customers with appropriate protections against unauthorized disclosures of the inner workings of its proprietary, trade secret tool.

25.

While there are many companies that provide data to use for sales pitches and product demonstrations, these companies rely on recorded snapshots of product environments or perform front-end manipulations. But, until recently, only DemoBlox provided customized, real-time data, created to the specifications of a client, its industry, and its particular project.

9

26.

DemoBlox developed numerous confidential trade secrets, including but not limited to, the source code for its web browser extension, proprietary and specialized data intake spreadsheets, and presentations given only to customers that explain how the back end of the product technically works (hereinafter, the "Trade Secrets"). Before a customer could access Trade Secrets, appropriate binding, non-disclosure documentation was required.

27.

DemoBlox utilizes Google Chrome extensions to deliver its product to customers.  Web browser extensions are similar to smartphone apps, but they live in and interact with the web browser.  Extensions let a user control how websites load and behave, add extra features to a web browser, or integrate a service within the browser.  For example, a popular extension LastPass, allows users to save passwords for various websites.  When a user visits a website where the user has saved a password, the LastPass extension may auto-populate the username and password for the user.

28.

Like smartphone operating programs use app stores to deliver apps to customers, web browsers, such as Google Chrome, allow developers to provide their

products to users through a web store.  Google Chrome extensions are available in the Google Chrome Web Store.  Most extensions are publicly available, and a user can find an extension by searching for it in the Google Chrome Web Store.

29.

Google requires that developers publicly disclose the source code of web browser extensions available in the Google Chrome Web Store.  This allows the public to view the code and ensure that it does not contain malware.

30.

Developers who wish to protect their code from public disclosure can utilize the "unlisted" extension option in the Google Chrome Web Store.  The extension cannot be found by the general public.  A user can only access the extension if they are provided the extension link by the developer.  By requiring the user to enter a binding non-disclosure agreement as precondition to receiving the extension link, the developer can protect its trade secrets while also enjoying the ease of use of Google's Chrome delivery system.

31.

DemoBlox delivers its product by means of Google's "unlisted" extension option.  Once a customer enters a non-disclosure agreement with DemoBlox, they receive a link to download an extension for the Google Chrome browser.  The code

11

is viewable by the user per the terms of the Chrome Web Store.  However, the trade secret code is protected by the non-disclosure agreement entered between DemoBlox and the customer.

32.

The Trade Secrets are further protected by the Google Chrome Web Store Terms of Service, available at:

https://ssl.gstatic.com/chrome/webstore/intl/en/gallery_tos.html.  A user downloading extensions from the Google Chrome Web Store agrees to be bound by the provisions of the Terms of Service.  The Terms of Service further provide:

> You agree that Google and/or third parties own all right, title and interest in and to the Web Store and the Products available through the Web Store, including without limitation all applicable Intellectual Property Rights in the Products. "Intellectual Property Rights" means any and all rights existing under patent law, copyright law, trade secret law, trademark law, unfair competition law, and any and all other proprietary rights worldwide. ***You agree that you will not, and will not allow any third party to, (i) copy, sell, license, distribute, transfer, modify, adapt, translate, prepare derivative works from, decompile, reverse engineer, disassemble or otherwise attempt to derive source code from the Products, unless otherwise permitted***, (ii) take any action to circumvent or defeat the security or content usage rules provided, deployed or enforced by any functionality (including without limitation digital rights management or forward-lock functionality) in the Products, (iii) use the Products to access, copy, transfer, transcode or retransmit content in violation of any law or third party rights, or (iv) remove, obscure, or alter Google's or any third party's copyright notices, trademarks, or other proprietary rights notices affixed to or contained within the Products.

Terms of Service ¶ 3.7 (emphasis added).

33.

During the onboarding process, DemoBlox also provides additional Trade Secrets directly to customers, but only after a binding, non-disclosure agreement is entered by the customer.

34.

DemoBlox carefully protects its Trade Secrets.  DemoBlox's Trade Secrets are not readily ascertainable.  DemoBlox has taken extensive measures to preserve and protect its Trade Secrets for the purpose of maintaining their competitive advantage in the marketplace.  Trade Secrets may be accessed by employees or shareholders of DemoBlox, who each must enter binding non-disclosure agreements. The Trade Secrets are stored on encrypted cloud servers, that may only be accessed with a password and two-factor authentication.  All data transmitted via the DemoBlox solution is encrypted via SSL.  All customers and potential customers of DemoBlox must enter non-disclosure agreements before the Trade Secrets are accessed or discussed in detail.

35.

DemoBlox's Trade Secrets derive independent economic value from not being generally known, and not being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information.

36.

DemoBlox's services are sold to customers world-wide, and its Trade Secrets are used in interstate commerce. DemoBlox's customers, in turn, utilize the product to sell goods and services in interstate commerce and worldwide.

**DemoBlox and Terminus Initial Relationship**

37.

On January 8, 2021, DemoBlox and Terminus first began discussing a commercial relationship.

38.

On June 14, 2021, Terminus and DemoBlox entered into a Proof of Value Agreement. Pursuant to the agreement, Terminus agreed to pay DemoBlox in exchange for the opportunity to determine the feasibility and functionality of DemoBlox, as the first step towards full implementation of DemoBlox.

39.

On June 14, 2021, Terminus and DemoBlox orally agreed that both parties would enter into a mutual binding non-disclosure agreement that would govern their relationship and protect the trade secrets and confidential information of both parties.

40.

On June 15, 2021, DemoBlox began the proof of value onboarding and presented a discovery workshop to a limited internal team at Terminus, the Terminus Solutions Consulting team.  DemoBlox did not share trade secrets or confidential information at this workshop.

41.

In accordance with the previous oral agreement, on June 16, 2021, Terminus and DemoBlox entered into the MNDA (attached as Exhibit C) which provides:

> The Receiving Party shall use the Disclosing Party's Confidential Information *only for the purposes of joint activity* with the Disclosing Party, and *shall protect* such Confidential Information *from disclosure to third Parties* using at least the same degree of care used to protect its own Confidential Information, but in any event a reasonable degree of care. Confidential Information will not be copied, in whole or in part, except as necessary for performance as authorized hereunder. The Receiving Party will mark each copy, including its storage media, with all notices which appear on the original.

Ex. C ¶ 3 (emphasis added).

15

42.

The MNDA provides further that:

> *The Receiving Party may disclose the Disclosing Party's Confidential Information to its employees, officers, agents, directors, consultants and affiliates (collectively, the "Representatives")* who have a need to know, and *provided such Representatives* (i) *use the Confidential Information for the purposes of joint activity with the Disclosing Party only*, and (ii) *are bound to protect the Confidential Information as required hereunder*. The Parties shall each be responsible for any breach of the terms of this Agreement by them or their respective Representatives and agree, at their sole expense, to take all reasonable measures (including but not limited to court proceedings) to restrain their respective Representatives from prohibited or unauthorized disclosure or use of the Confidential Information. The term "affiliate" as used herein means any person or entity controlling, controlled by or under common control with a Party.

*Id.* ¶ 4 (emphasis added).

43.

The MNDA states that it "shall apply to any Confidential Information that may have been provided to the Receiving Party prior to the effective date hereof." *Id.* ¶ 12.

44.

The MNDA is governed by Georgia law and expressly provides that injunctive relief is appropriate "if either Party breaches or threatens to breach any of the provisions of this Agreement." *Id.* ¶¶ 11; 14.

16

45.

Terminus informed DemoBlox it preferred to use its non-disclosure language, and DemoBlox agreed.   The MNDA was drafted by Terminus and provided by Terminus via Docusign to DemoBlox.  All parties executed the MNDA.  *See* Ex. D.

46.

After the MNDA was entered, DemoBlox provided Terminus with the link to download the "unlisted" DemoBlox extension for the Google Chrome browser, which contains the Trade Secrets of DemoBlox.  DemoBlox provided additional materials to Terminus that constitute Trade Secrets, including a proprietary data-intake spreadsheet, a slide deck explaining the technical details of DemoBlox, and other proprietary information.

47.

On June 21, 2021, the Terminus Solutions Consulting team presented to all sales employees of Terminus a presentation, drafted by DemoBlox, that explained in detail how DemoBlox could provide its solution to Terminus.  The presentation contained the Trade Secrets of DemoBlox.

48.

In June and July 2021, DemoBlox conducted its onboarding process and held a series of meetings with Terminus.  DemoBlox trained Terminus employees on how

to use the specialized data intake spreadsheets, extension, and viewed other Trade Secrets of DemoBlox.  At one of these workshops, a Terminus employee Pamela Brungardt, a Senior Solutions Consultant, stated to Fisher and Kim that Terminus had attempted to create an in-house product that would accomplish what DemoBlox could do but had been unsuccessful.  She stated that she "cannot depend on this load data [for the internal Terminus solution].  It is hit or miss."

49.

During the meetings, DemoBlox provided its Trade Secrets to Terminus.  The Trade Secrets provided by DemoBlox explained in detail how to build the product and would be sufficient to allow someone to "reverse engineer" the product.  These meetings were video and audio recorded by Terminus, and upon information and belief, the recordings were accessible to all Terminus employees, including Defendants Hellerman and McDonald.

50.

On August 22, 2021, Terminus and DemoBlox entered a one-year subscription agreement whereby DemoBlox began to provide its services in real-time for Terminus users to perform targeted sales demonstrations.

18

51.

Beginning on September 1, 2021, and continuing through the end of October, DemoBlox provided a series of workshops to capture detailed development requirements and customized data sets with Terminus. DemoBlox trained Terminus employees on how to utilize the DemoBlox platform and provided Trade Secrets to Terminus employees. The Trade Secrets provided by DemoBlox explained in detail how to build the data/product and would be sufficient to allow someone to "reverse engineer" the product.

52.

Terminus employees McDonald, Hellerman, Aleksei Svetliakov ("Svetliakov") and Jason Deegan ("Deegan") had access to the Trade Secrets of DemoBlox during the course of their employment at Terminus. Under the terms of the MNDA, Terminus was permitted to disclose the Trade Secrets to McDonald, Hellerman, Svetliakov, and Deegan, but had to ensure the Trade Secrets were used only for the joint activity and not disclosed.

**Current Terminus Employees Form Saleo**

53.

Upon information and belief, immediately after obtaining access to the Trade Secrets of DemoBlox, Terminus employees Svetliakov and Defendants McDonald

and Hellerman used the Trade Secrets of DemoBlox to plan a competing venture to provide the exact same services.  This was done with the financial backing and support of Terminus employees.

54.

Unbeknownst to DemoBlox, McDonald, Hellerman, and Svetliakov caused a new company, Saleo, Inc. to be incorporated in Delaware on September 21, 2021.

55.

According to their publicly available LinkedIn profiles, McDonald, Hellerman, Svetliakov, and Deegan were employees of Terminus at the time Saleo was created.  *See* Exs. A, B, E & F.

56.

Upon information and belief, Terminus actively supported the founding of Saleo, which appears to have been done by its employees during the course of their employment.  Further, Saleo would later announce that three members of the Terminus management team were investors in Saleo, indicating management's full support of the Saleo venture.

57.

Saleo purports to provide the identical functionality as the product provided by DemoBlox.

58.

Given that it took Kim and Fisher four years to develop a working DemoBlox product, and Terminus had previously been unable to develop a working product, it is not possible that Saleo's technology was developed without reference to the Trade Secrets of DemoBlox.

59.

On October 12, 2021—less than a month after Saleo was incorporated in Delaware—McDonald was still a Terminus employee and was actively involved with the implementation of DemoBlox at Terminus. Upon information and belief, McDonald is the only Terminus employee named Justin that was employed at the time. An October 12, 2021 email, references "Justin's" involvement with DemoBlox, including that the Terminus employee author is "collaborating with Justin to get a set of playbooks that support most use cases for us to leverage in demos." *See* Ex. P (referencing "Justin").

60.

Upon information and belief, Terminus, McDonald, Hellerman, and Saleo improperly used the Trade Secrets of DemoBlox to create Saleo.

61.

In October 2021, Bryan Wade ("Wade"), Chief Product Officer for Terminus (who Saleo later publicly announced was a personal funder of Saleo), contacted DemoBlox to request they enter a service contract for a high-profile sales demo.  The parties entered into a statement of work on October 22, 2021.

62.

The Internet Archive Wayback Machine is a digital archive of websites as they have appeared on the internet in the past.  It allows users to go back in time and see how websites looked in the past.  The Wayback Machine crawls the internet and creates snapshots of websites on various dates.

63.

On December 18, 2021, according to the Wayback Machine, https://saleo.io went live, describing its product offerings to the public.  *See* Ex. G.

64.

Saleo's website purports to provide the exact same services as DemoBlox. The website states: "Personalize every element of your demo to best reflect buyer requirements."  *See* Ex. G at 1.   This is exactly the business model of DemoBlox. Saleo's website claims that it allows a user to "[c]ontrol areas of your software presentation never before possible. . . .  Modify text, terminology and nomenclature

to build a story that resonates with your buyers.  Adjust graphs and charts in real time." *See id.* at 5.  "Utilize the Saleo Chrome extension to modify elements directly in your SaaS product." *See id.* at 6.  This approach is the same methods developed by DemoBlox at considerable time and expense and shared with Terminus pursuant to the MNDA.

65.

In February 2022, Terminus and DemoBlox entered a new agreement, purportedly for the provision of additional services.  But, given that Terminus employees and executives were planning a competing venture, Terminus did not actually intend to receive additional services from DemoBlox.

66.

Rather, for the first time, Terminus (through its employee Wade, Saleo investor) required that DemoBlox add additional legal language to its standard contracts.  This language was drafted by Terminus, and Terminus insisted on the addition.  The sole purpose of this new agreement appears to be to attempt to replace and supersede the legal terms of the MNDA, and thereby attempt to provide Terminus legal cover for the breaches of contract that had already occurred.

23

67.

Prior to entering the agreement, Terminus concealed from DemoBlox that Terminus was in breach of the MNDA by allowing its employees to use the Trade Secrets of DemoBlox to create a competing company. Terminus concealed from DemoBlox that three individuals on its management team (including the employee negotiating this very contract) had, or were, planning to have a personal financial investment in a competing company.

68.

DemoBlox believed it was entering a new statement of work for the provision of services. Terminus did not disclose to DemoBlox that it never intended to receive the services. Terminus fraudulently induced DemoBlox to enter the February 25, 2022 Agreement and its specific legal provisions.

69.

Only three days after the February 25, 2022 Agreement was signed, investor Wade contacted Kim and ordered him to hold rendering services under the February 25, 2022 Agreement until further notice. DemoBlox never rendered any services under the February 25, 2022 Agreement. DemoBlox was never paid the consideration due upon signing by Terminus under the February 25, 2022

Agreement, even though the Agreement calls for the payment of $23,000 upon signing.

70.

On April 7, 2022, Terminus sent notice to DemoBlox that it was rescinding the February 25, 2022 Agreement.

71.

On April 28, 2022, Saleo registered to do business in Georgia.

72.

Since that time, Terminus has not engaged DemoBlox for any further projects.

73.

Prior to Saleo's entry into the marketplace, DemoBlox was courting a large potential customer. After significant interest, this large potential customer informed Kim that they would be unable to move forward with the DemoBlox relationship because their founder had invested in Saleo, which offered the same solution. Upon information and belief, the large potential customer is now a Saleo customer.

**Current Terminus Employees Provide Support to Saleo**

74.

On May 5, 2022, Saleo publicly announced that it has raised $1.5 million in funding. Saleo's website announces that its investors include Tim Kopp, CEO of

Terminus; Wade, Chief Product Officer of Terminus (and primary contact for DemoBlox); and Eric Spett, Co-Founder of Terminus.  *See* Ex. H.

75.

DemoBlox's system allows it to see the access points for certain users.  User id ac0db261859f08dc143dbed7560e1251 is assigned to investor Wade, CPO of Terminus.  As of the date of the filing of this lawsuit, investor Wade, CPO of Terminus, personally accessed the Trade Secrets of DemoBlox 96 times. *See* Ex. I.

76.

Wade has continued to access the Trade Secrets of DemoBlox, including on May 5, 2022. *Id.*  This means that even on the date that his investment in Saleo was publicly announced, Wade accessed the Trade Secrets of DemoBlox.

77.

On May 25, 2022, Wade accessed the Trade Secrets of DemoBlox for 41 minutes, from 8:57am – 9:39am. *See id*.  On June 3, he accessed the Trade Secrets of DemoBlox for 87 minutes, from 9:09am – 10:36am. *See id*.

78.

G2.com is a website where users can review software products and services. Saleo has been reviewed by 12 different users, all of which occurred on or around May 27, 2022. *See* Ex. J.  Of the 12 existing reviews, only 4 of the reviewers used

their names with their review.   Each of these 4 reviewers is a Terminus employee and had access to the Trade Secrets of DemoBlox.   "Ben I." is Ben Ivers, a Terminus employee, a primary user of DemoBlox and the contact point for DemoBlox.   *See* Ex. K.   "Tenisha G." is Tenisha Griggs, a Terminus employee.   *See* Ex. L.   "Bryan W." is Bryan Wade, Terminus CPO, DemoBlox contact point, and Saleo investor. *See* Ex. M.   "Crawford B." is Crawford Berry, a Terminus employee and active DemoBlox user.   *See* Ex. N.

79.

These entries confirm that Terminus is a customer of Saleo.

**<u>DemoBlox Discovers the Actions of Defendants</u>**

80.

On May 5, 2022, Fisher and Kim viewed a LinkedIn post announcing the capital event and learned for the first time of Terminus' relationship to Saleo.

81.

On May 5, 2022, DemoBlox first learned of the improper actions of Terminus. It realized that the February 26, 2022 Agreement was induced by fraud.   It did not delay in acting to rescind the February 26, 2022 Agreement.

82.

Via letter on June 9, 2022, DemoBlox notified Terminus of its investigation into Saleo and Terminus, and its suspicion that Terminus has breached the terms of the MNDA and misappropriated the Trade Secrets of DemoBlox. *See* Ex. O. DemoBlox demanded that Terminus provide it reasonable assurances that this was not the case. *Id.* DemoBlox further clarified that the February 26, 2022 Agreement was rescinded. *Id.*

83.

Terminus did not provide reasonable assurances that it had not breached the terms of the MNDA and misappropriated the Trade Secrets of DemoBlox.

84.

Upon information and belief, Saleo does not yet have a working product, but is using DemoBlox trade secrets to create one.

## COUNT I
### Violation of the Defend Trade Secrets Act
### (Against All Defendants)

85.

DemoBlox repeats and realleges the allegations set forth in paragraphs 1-84 as if fully restated herein.

28

86.

DemoBlox owns a variety of information that it developed at considerable time and expense. Among other pieces of valuable information owned by DemoBlox, the information at issue in this lawsuit consists of the code for its Google Chrome extension, proprietary and specialized data intake spreadsheets, and its internal presentations given only to customers that explain the back end of how the product technically works and how it is to be used by the customer (previously defined above as "Trade Secrets").

87.

DemoBlox's services are sold to customers world-wide, and its Trade Secrets are used in interstate commerce. DemoBlox's customers, in turn, utilize the product to sell goods and services in interstate commerce and worldwide.

88.

DemoBlox's Trade Secrets are not generally known or accessible. The Trade Secrets are unable to be gleaned from publicly-available sources.

89.

DemoBlox took reasonable measures to keep its Trade Secrets secret. Among other things, DemoBlox requires that its employees, shareholders, and customers enter non-disclosure agreements. The Trade Secrets are stored on encrypted cloud

servers, that may only be accessed with a password and two-factor authentication. All data transmitted via the DemoBlox solution is encrypted via SSL. DemoBlox disseminates its product through an "unlisted" link on the Google Chrome Web Store. The Terms and Conditions of the Google Chrome Web Store, of which DemoBlox is a third-party beneficiary, provide further protection from theft of its Trade Secrets.

90.

DemoBlox's Trade Secrets derive independent value from their secrecy. DemoBlox's business model requires that companies pay for DemoBlox's services, meaning that if DemoBlox's Trade Secrets were publicly available, there would be little to no incentive for companies to pay for its services.

91.

DemoBlox's Trade Secrets were developed over a period of four years, at considerable cost and effort. A competitor would have extreme difficulty duplicating the efforts of DemoBlox without access to its Trade Secrets.

92.

DemoBlox disclosed its Trade Secrets to Terminus only pursuant to the MNDA and in connection with the commercial relationship between the parties. At the time of disclosure, Terminus knew that knowledge of the Trade Secrets was

acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and/or limit the use of the trade secrets. The MNDA prohibited the disclosure of the Trade Secrets.

93.

Terminus never had authority or license to use DemoBlox's Trade Secrets outside of the Terminus/DemoBlox commercial relationship.

94.

Upon information and belief, Terminus has disclosed DemoBlox's Trade Secrets to its current or former employees, and to Saleo in order to unlawfully compete with DemoBlox.

95.

Defendants intentionally misappropriated the Trade Secrets of DemoBlox for their own economic benefit and with the intention and knowledge that their conduct would injure DemoBlox.

96.

Terminus has engaged in misappropriation of the Trade Secrets by acquiring them by improper means. Terminus acquired the Trade Secrets from DemoBlox on false pretenses of entering a commercial relationship with DemoBlox.

97.

Terminus has engaged in misappropriation of the Trade Secrets by disclosing the Trade Secrets without the express or implied consent of DemoBlox.  Terminus used improper means to acquire knowledge of the Trade Secrets, and at the time of disclosure knew or had reason to know that the Trade Secrets were derived from or through a person who had used improper means to acquire the trade secret, acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; and derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret.

98.

Saleo has engaged in misappropriation of the Trade Secrets by acquiring them by improper means.  Saleo acquired the Trade Secrets from Terminus, McDonald or Hellerman, even though Saleo knew or had reason to know that the Trade Secrets were acquired through improper means.

99.

Saleo has engaged in misappropriation of the Trade Secrets by using the Trade Secrets without the express or implied consent of DemoBlox.  Saleo used improper means to acquire knowledge of the Trade Secrets, and at the time of use knew or had

reason to know that the Trade Secrets were derived from or through a person who had used improper means to acquire the trade secret, acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; and derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret.

100.

McDonald and Hellerman have engaged in misappropriation of the Trade Secrets by acquiring them by improper means.  McDonald and Hellerman acquired the Trade Secrets from Terminus, even though McDonald and Hellerman knew or had reason to know that the Trade Secrets were acquired through improper means.

101.

McDonald and Hellerman have engaged in misappropriation of the Trade Secrets by using the Trade Secrets without the express or implied consent of DemoBlox.  McDonald and Hellerman used improper means to acquire knowledge of the Trade Secrets, and at the time of use knew or had reason to know that the Trade Secrets were derived from or through a person who had used improper means to acquire the trade secret, acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; and

derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret.

102.

As a direct and proximate result of Defendants' willful, improper, and unlawful disclosure and use of DemoBlox's Trade Secrets, DemoBlox has and will continue to suffer damages and irreparable injury.

103.

Pursuant to 18 U.S.C. § 1836(b)(3)(A), Defendants' actual and threatened use and misappropriation of DemoBlox's Trade Secrets should be enjoined from further disclosure or use.  Defendants' conduct in misappropriating DemoBlox's Trade Secrets is willful and malicious, warranting an award of exemplary damages in accordance with 18 U.S.C. § 1836(b)(3)(C) and reasonable attorneys' fees in accordance with 18 U.S.C. § 1836(b)(3)(D).

## COUNT II
### Violation of Georgia Trade Secrets Act
### (Against All Defendants)

104.

DemoBlox repeats and realleges the allegations set forth in paragraphs 1-84 as if fully restated herein.

105.

Defendants are "persons" as defined in O.C.G.A. § 10-1-761(3).

106.

DemoBlox owns a variety of information that it developed at considerable time and expense. Among other pieces of valuable information owned by DemoBlox, the information at issue in this lawsuit consists of the code for its Google Chrome extension, proprietary and specialized data intake spreadsheets, and its internal presentations given only to customers that explain the back end of how the product technically works and how it is to be used by the customer (previously defined above as "Trade Secrets").

107.

DemoBlox's Trade Secrets are not generally known or accessible. The Trade Secrets are unable to be gleaned from publicly available sources.

108.

DemoBlox took reasonable measures to keep its Trade Secrets secret. Among other things, DemoBlox requires that its employees, shareholders, and customers enter non-disclosure agreements. The Trade Secrets are stored on encrypted cloud servers, that may only be accessed with a password and two-factor authentication. All data transmitted via the DemoBlox solution is encrypted via SSL. DemoBlox

disseminates its product through an "unlisted" link on the Google Chrome Web Store.  The Terms and Conditions of the Google Chrome Web Store, of which DemoBlox is a third-party beneficiary, provide further protection from theft of its Trade Secrets.

109.

DemoBlox's Trade Secrets derive independent value from their secrecy. DemoBlox's business model requires that companies pay for DemoBlox's services, meaning that if DemoBlox's Trade Secrets were publicly available, there would be little to no incentive for companies to pay for its services.

110.

DemoBlox's Trade Secrets were developed over a period of four years, at considerable cost and effort.  A competitor would have extreme difficulty duplicating the efforts of DemoBlox without access to its Trade Secrets.

111.

DemoBlox disclosed its Trade Secrets to Terminus only pursuant to the MNDA and in connection with the commercial relationship between the parties.  At the time of disclosure, Terminus knew that knowledge of the Trade Secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the

36

trade secrets and/or limit the use of the trade secrets.  The MNDA prohibited the disclosure of the Trade Secrets.

112.

Defendants, individually and in conspiracy and jointly with one another, have misappropriated DemoBlox's Trade Secrets by acquiring them through improper means, or knowing that it was acquired by improper means.

113.

Defendants, individually and in conspiracy and jointly with one another, have misappropriated DemoBlox's Trade Secrets by disclosing them or using them. Defendants used improper means to acquire knowledge of the Trade Secrets.  At the time of use or disclosure, Defendants knew it was derived from a person who utilized improper means to acquire it, acquired it under circumstances giving rise to a duty to DemoBlox to maintain its secrecy or limit its use, and derived it from or through a person who owed a duty DemoBlox to maintain its secrecy or limit its use.

114.

Defendants' misappropriation and improper use of DemoBlox's Trade Secrets have caused DemoBlox to suffer irreparable harm for which it has no adequate remedy at law.

115.

Pursuant to O.C.G.A. § 10-1-762, Defendants should be enjoined from further misappropriation and use of these trade secrets.

116.

In addition, pursuant to O.C.G.A. § 10-1-763, damages should be awarded to DemoBlox for this misappropriation and improper use.  Willful and malicious misappropriation and use entitles DemoBlox to exemplary damages and reasonable attorneys' fees.  O.C.G.A. §§ 10-1-763, 764.

**COUNT III**
**Breach of Contract**
**(Against Defendant Terminus)**

117.

DemoBlox repeats and realleges the allegations set forth in paragraphs 1-84 as if fully restated herein.

118.

On June 16, 2021, Terminus and DemoBlox entered the Mutual Non-Disclosure Agreement.  The MNDA is a valid and enforceable contract.

119.

Pursuant to the MNDA, DemoBlox provided its Trade Secrets ("Confidential Information" under the terms of the MNDA) to Terminus.

120.

Terminus agreed in the MNDA to "protect such Confidential Information from disclosure to third parties[.]"  Ex. C ¶ 3.  It also agreed to use the Confidential Information "only for the purposes of joint activity with the Disclosing Party."  *Id.*

121.

 Terminus agreed to provide DemoBlox's Confidential Information to its employees, officers, agents, directors, consultants, and affiliates only if they have a need to know the information and "for the purposes of joint activity with the Disclosing Party only."  *Id.* at 4.  Terminus further agreed that it would be responsible for any breach of the MNDA by its employees, officers, agents, directors, consultants, and affiliates and take reasonable measures to restrain them from prohibited or unauthorized disclosure of the Confidential Information.  *Id.*

122.

The MNDA provides that injunctive relief, in addition to damages, is an appropriate remedy for a breach of the MNDA.  *See* Ex. C ¶ 11.

123.

Upon information and belief, Terminus and its employees, officers, agents, directors, consultants, and affiliates have used DemoBlox's Confidential Information for purposes other than pursuing a relationship with DemoBlox.

Terminus and its employees, officers, agents, directors, consultants, and affiliates have caused or allowed the Confidential Information to be shared with third parties for the purpose of competing with DemoBlox.

124.

Terminus has breached the MNDA.

125.

DemoBlox is entitled to damages in an amount to be determined at trial.

126.

Under the law and the express language of the MNDA, DemoBlox is also entitled to injunctive relief barring current and future violations of the MDNA.

### COUNT IV
### Aiding and Abetting Breach of Contract
### (Against Defendants McDonald, Hellerman, and Saleo)

127.

DemoBlox repeats and realleges the allegations set forth in paragraphs 1-84 as if fully restated herein.

128.

Defendants McDonald, Hellerman, and Saleo knew of the terms and requirements of the MNDA given its founders' previous or current employment at Terminus.

40

129.

Defendants McDonald, Hellerman, and Saleo willfully, maliciously, and knowingly induced Terminus to breach the terms of the MNDA and provide DemoBlox's Trade Secrets to Saleo. The malicious and illegal purpose was to provide an unfair advantage to Saleo in entering the same competitive marketplace.

130.

Defendants McDonald, Hellerman, and Saleo are jointly liable with Terminus for the injuries sustained by DemoBlox.

131.

DemoBlox has been directly harmed because of the actions of Defendants McDonald, Hellerman, and Saleo.

### COUNT V
### Punitive Damages
### (Against All Defendants)

132.

DemoBlox repeats and realleges the allegations set forth in paragraphs 1-84 as if fully restated herein.

133.

Defendants' tortious and unlawful acts, as described in this Complaint, have been committed with the specific intent to injure DemoBlox.

134.

Defendants' misconduct was intentional, deliberate, malicious, willful, and designed to injure, and shows that entire want of care which would raise the presumption of conscious indifference to the consequences of their actions.  Punitive damages are appropriate to punish, penalize, and deter Defendants' behavior.

135.

DemoBlox requests, pursuant to O.C.G.A. § 51-12-5.1, that punitive damages be awarded against Defendants in an amount to be determined by the jury.

## COUNT VI
### Attorneys' Fees under the Agreements
### (Against Defendant Terminus)

136.

DemoBlox repeats and realleges the allegations set forth in paragraphs 1-84 as if fully restated herein.

137.

Under the MNDA, "[i]n the event of any action or proceeding to enforce or interpret any of the provisions of this Agreement, the prevailing Party shall be entitled to be reimbursed for the costs of such action or proceeding, including attorneys fees."  Ex. C ¶ 14.

138.

DemoBlox has initiated this action to enforce its rights under the MNDA. Accordingly, it is entitled to its reasonable attorneys' fees and other costs associated with this action.

## <u>COUNT VII</u>
### Statutory Attorneys' Fees
### (Against All Defendants)

139.

DemoBlox repeats and realleges the allegations set forth in paragraphs 1-84 as if fully restated herein.

140.

Under 18 U.S.C. § 1836(b)(3)(D) and O.C.G.A. § 10-1-764, DemoBlox may recover reasonable attorneys' fees if it prevails in this dispute because of the willful and malicious misappropriation that exists.

141.

Accordingly, DemoBlox is entitled to its reasonable attorneys' fees and other costs associated with this action.

## COUNT VIII
## Attorneys' Fees under O.C.G.A. § 13-6-11
### (Against All Defendants)

142.

DemoBlox repeats and realleges the allegations set forth in paragraphs 1-84 as if fully restated herein.

143.

The Defendants have acted in bad faith and have caused DemoBlox unnecessary trouble and expense.

144.

Accordingly, DemoBlox is entitled to its reasonable expenses of litigation, including attorneys' fees, pursuant to O.C.G.A. § 13-6-11.

**WHEREFORE**, DemoBlox prays that judgment be entered against Defendants and that forms of relief required by law and equity be awarded, including:

(a)     Preliminary injunctive relief;

(b)     Compensatory and punitive damages in amounts to be proven at trial;

(c)     Exemplary damages of two times the amount of compensatory damages pursuant to 18 U.S.C. § 1836(b)(3)(B) and O.C.G.A. § 10-1-763;

(d)     Permanent injunctive relief;

(e)     Reasonable attorneys' fees, costs, and other expenses; and

(f)     Such other relief as this Court deems just and appropriate.

Respectfully submitted, this 14th day of June 2022.

KREVOLIN & HORST, LLC

*/s/ Kana A. Caplan*
Halsey G. Knapp, Jr.
Georgia Bar No. 425320
Kana A. Caplan
Georgia Bar No. 621805
One Atlantic Center
1201 W. Peachtree Street, NW
Suite 3250
Atlanta, Georgia 30309
hknapp@khlawfirm.com
caplan@khlawfirm.com
(404) 888-9700
(404) 888-9577 (facsimile)
*Counsel for Plaintiff*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

/s/ Kana A. Caplan
Kana A. Caplan

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

DEMOBLOX, INC.,                              )
                                            )
   Plaintiff,                           )
                                            )          CIVIL ACTION NO.
vs.                                         )
                                            )          _____
TERMINUS SOFTWARE, INC.;                    )
SALEO, INC.; JUSTIN MCDONALD;               )          **JURY TRIAL DEMANDED**
and DANIEL HELLERMAN,                        )
                                            )
   Defendants.                          )

## <u>VERIFICATION</u>

Pursuant to 28 U.S.C. § 1746, I declare and verify under penalty of perjury that I have reviewed the Verified Complaint in the above-captioned matter with regard to the facts contained therein. The facts set forth therein are true and correct where derived from my own personal knowledge and are believed to be true and correct where derived from the knowledge of others or from documents maintained in the course of business or from public records.

This 14th day of June 2022.

Peter Kim

_____

47